## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FRANCES HOFFNAGLE, LORI MONROE, and CARLA TRACY, individually and on behalf of all others similarly situated,<br>    Plaintiffs, <br><br>              vs.<br><br>THE CONNECTICUT WATER COMPANY<br>    Defendant. | NOVEMBER 10, 2023<br><br><br>**NOTICE OF REMOVAL** |

### INTRODUCTION

Defendant Connecticut Water Company (or "CWC") agrees with Plaintiffs that its public water supply is contaminated with PFAS chemicals that should be removed from water served to consumers (at the expense of those who caused the contamination).  In fact, CWC filed suit in 2021 against the companies that caused that contamination, and that case has been consolidated, and is currently pending alongside, hundreds of similar suits by public water providers in MDL 2873 before Judge Richard Gergel in the District of South Carolina ("MDL").

The Hoffnagle Plaintiffs filed the instant action against CWC, alleging the same harms for which CWC seeks relief in the action pending in the MDL for more than two years.  CWC hereby removes this case pursuant to 28 U.S.C. § 1331, as involving an embedded federal question.  Because the Hoffnagle complaint and CWC's complaint allege harms caused by the same contamination, CWC will also submit a Notice of Potential Tag-Along with the Judicial Panel on Multidistrict Litigation ("JPML").  In an identical action, the JPML determined that a putative class action against a water provider alleging contamination of drinking water and that

water provider's action alleging the same contamination "are sufficiently intertwined that transfer is necessary to avoid duplicative discovery and pretrial proceedings."[1] A copy of the Complaint is attached.

## I.      BACKGROUND & PROCEDURAL HISTORY

CWC is a public water provider that sued the manufacturers of a type of fire-fighting foam known as aqueous film-forming foam ("AFFF").  As alleged, the Defendant AFFF Manufacturers long knew that the normal, intended use of AFFF for training and active incident response would release PFAS into the environment, where these compounds would migrate into drinking water supplies.  CWC filed its complaint against the AFFF Manufacturers[2] in the District of Hartford on October 20, 2021; two defendants removed the case to the District of Connecticut on November 18, 2021, and on the same day filed a Notice of Potential Tag-Along Action with the United States Judicial Panel on Multidistrict Litigation ("JPML").  CWC's case is pending in MDL 2873 before Judge Richard Gergel in the District of South Carolina.[3]

---

[1] *See* note 3, *infra*.

[2] CWC's Complaint names 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); AGC CHEMICALS AMERICAS, INC.; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DU PONT DE NEMOURS AND COMPANY; KIDDE PLC, INC.; KIDDE- FENWAL, INC.; NATIONAL FOAM, INC.; NATION FORD CHEMICAL COMPANY; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; TYCO FIRE PRODUCTS LP (individually and as successor-in-interest to The Ansul Company); and UTC FIRE & SECURITYAMERICAS CORPORATION, INC.
[3] On behalf of all public water providers in the United States, Plaintiffs' Executive Committee has negotiated national class settlements with Defendants DuPont and 3M for $1.185 billion and

CWC is one of approximately 200 public drinking water providers from across the United States that filed similar suits against the AFFF Manufacturers and are now before MDL 2873. The water providers allege generally that the AFFF Manufacturers should not have used certain PFAS compounds in AFFF given the likelihood that these chemicals would contaminate drinking water supplies and present potential environmental and human health risks, that the Manufacturers knew about potential risks but concealed that information from everyone (including federal and state regulators).

The MDL comprises far more plaintiffs than water providers, however. The docket includes cases brought by 27 Attorneys General, property owners (including airports, fire departments, and fire training facilities), and thousands of individuals alleging personal injuries. In these actions, as in CWC's case, plaintiffs generally allege that AFFF products used at airports, military bases, or certain industrial locations caused the release of PFOA or PFOS into local groundwater and contaminated drinking water supplies. With some minor variations, the same group of AFFF Manufacturer defendants is named in each action.

In ordering the creation of MDL 2873, the JPML observed that "[t]hese actions thus share factual questions concerning the toxicity of PFOA and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants conspired or cooperated to conceal the dangers of PFOA and PFOS in their products." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F.Supp.3d 1391,

---

$10.5-12.5 billion, respectively. The water providers' claims remain against the non-settling defendants.

1394 (U.S.Jud.Pan.Mult.Lit. 2018). "Centralization will [thus] eliminate duplicative discovery; prevent inconsistent pretrial rulings (including with respect to discovery, privilege, and *Daubert* motion practice); and conserve the resources of the parties, their counsel, and the judiciary." *Id*.

The Panel found that although the actions include "personal injury cases brought by individuals who allegedly drank contaminated groundwater, class actions seeking to represent individuals who live near sites where AFFF was used and assert claims for medical monitoring and property damage, and cases brought by water authorities and other governmental entities seeking costs for environmental remediation or upgrades to water treatment systems," they all allege "the same mode of groundwater contamination caused by the same product" and "will involve significant and overlapping discovery of the AFFF manufacturers and their products." *Id*. at 1395.

Just months ago, the Panel found that water consumers' claims against a public water provider should be consolidated in the MDL where "[the consumers'] own water provider is alleging that the water contamination at issue in both" the consumers' lawsuit and the water provider's lawsuit "was caused, at least in part, by AFFFs." JPML, Transfer Order,[4] *In re: Aqueous Film-Forming Foams Prods. Liab. Litig*., MDL No. 2873 (Doc. 1927) (Jud.Pan.Multi.Litig. June 5, 2023) (not reported). These cases "substantially overlap" and "necessarily will involve common questions of fact regarding, for instance, the nature of the alleged PFAS contamination and its source(s)." *Id*. at 2.

---

[4] This Order is attached.

4

## II.     ALLEGATIONS IN THE HOFFNAGLE COMPLAINT

The instant claim against CWC alleges that the water CWC serves is contaminated with PFOA and PFOS "at levels deemed dangerous to human health by the current scientific understanding of PFAS chemicals as presented in peer-reviewed studies and relied upon by the EPA."  Hoffnagle Complaint at ¶¶ 21-22.  The plaintiffs also allege that CWC "knows that" "*any* detectable level of PFOA and/or PFOS poses a danger to its customers."  *Id*. ¶ 25 (emphasis in original).  Citing CWC's own complaint against the PFAS Manufacturers, the plaintiffs allege that CWC should be held liable under Connecticut's Product Liability Act and Unfair Trade Practices Act.  *Id*. ¶¶ 75-114.

The claims against CWC in the class action complaint are substantially similar to those being advanced in the MDL by CWC and share the factual questions identified by the JPML. Moreover, CWC and the Hoffnagle plaintiffs allege the same injury caused by the same AFFF Manufacturers' actions, and the determinations of liability involve interpretations of the federal Safe Drinking Water Act.  Because CWC submits that rather than being adversarial, the parties have an identity of interest to pursue and collect damages from the tortfeasors, these issues should be resolved in one forum that includes the AFFF Manufacturers alleged to have caused CWC's harm (which is the basis of the Hoffnagle complaint).

## III.     STANDARD OF REVIEW

A party may remove "[a]ny civil action of which the district courts have original jurisdiction." 28 U.S.C. § 1441(a). Section 1331, the federal-question statute, provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  Here, because Defendant CWC asserts that removal is proper pursuant to 28 U.S.C.§ 1331, Defendant must demonstrate that the

Plaintiffs' Complaint necessarily raises an issue of federal law.  *See Mihok v. Medtronic, Inc.*, 119 F.Supp.3d 22, 26 (D.Conn. 2015).

## IV.     ARGUMENT

### A.  CWC's operations are governed by the federal Safe Drinking Water Act.

The Safe Drinking Water Act, 42 U.S.C § 300f, *et seq.*, requires the Environmental Protection Agency to regulate the operation of public water systems.  Although thousands of substances are found in public drinking water, EPA regulates only a fraction of these.  The SDWA requires that, before EPA regulates a contaminant found in water, EPA must determine that the contaminant may have an adverse effect on human health, that it occurs in public water systems with a frequency and at levels of public health concern, and that regulation may reduce health risks in persons served by public water systems.  *Id*. at § 300g-1.

After conducting a thorough risk assessment, EPA issues a "primary drinking water regulations" for public water systems that specify a "maximum contaminant level" of the contaminant tat issue.  *Id*. at §§ 300f, 300g-1.  A "maximum contaminant level" (or "MCL") is the "maximum permissible level of a contaminant in water which is delivered to any user of a public water system."  *Id*. § 300f.  This regulatory process is not driven solely by health concerns, however; EPA must consider not only public health information but also the feasibility of compliance "taking cost into consideration" as well as the costs of compliance with the proposed MCL and alternative MCLs.  *Id*. § 300g-1.  Individual states may also regulate public water systems --- if EPA determines that the State's regulations "are no less stringent than" those promulgated by EPA.  *Id*. § 300g-2.

EPA has yet to set an MCL for any PFAS compound.  Earlier this year, EPA proposed

National Primary Drinking Water Regulation (NPDWR) for six PFAS including

perfluorooctanoic acid (PFOA), perfluorooctane sulfonic acid (PFOS), perfluorononanoic acid

(PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA, commonly known as GenX

Chemicals), perfluorohexane sulfonic acid (PFHxS), and perfluorobutane sulfonic acid (PFBS).[5]

EPA, *Per- and Polyfluoroalkyl Substances (PFAS) Proposed PFAS National Primary Drinking*

*Water Regulation*, available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas

(last accessed November 2, 2023).  The proposed regulation does not require any actions until it

is finalized.  *Id.*

The State of Connecticut adopted "Action Levels" of 16 parts per trillion (ppt) for PFOA

and 10 ppt for PFOS.  Connecticut State Department of Public Health, *Per- and polyfluoroalkl*

*Substances (PFAS)*, available at https://portal.ct.gov/DPH/Environmental-Health/PFAS/PFAS

(last accessed November 2, 2023).  "Action Levels are guidelines for drinking water that are

protective of public health and also feasible based upon analytical detection and treatment

technology."  *Id.*  The presence of state standards, however, do not ameliorate the central federal

question at issue in this litigation since, as noted above, the SWDA is central to the allegations of

in the instant complaint – whether Plaintiffs articulate it or not. *NASDAQ OMX Grp., Inc. v. UBS*

*Sec., LLC*, 770 F.3d 1010, 1019 (2d Cir. 2014) ("As we have frequently observed, "[t]he artful-

pleading doctrine, [a] corollary to the well-pleaded complaint rule, prevents a plaintiff from

---

[5] EPA is proposing individual MCLs of 4.0 nanograms per liter (ng/L) or parts per trillion (ppt) for PFOA and PFOS.  EPA, *PFAS National Primary Drinking Water Regulation Rulemaking*, 88 FR 18638 (March 29, 2023), available at https://www.federalregister.gov/d/2023-05471 (last accessed November 2, 2023).

avoiding [federal jurisdiction] by framing in terms of state law a complaint the real nature of [which] is federal, ... or by omitting to plead necessary federal questions in a complaint.””).

### B.  Because the Hoffnagle Complaint raises a federal issue, removal is proper.

Under 28 U.S.C. § 1331, federal courts have subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  For over 100 years, the United States Supreme Court has recognized "another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction," where "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg*., 545 U.S. 308, 312 (2005). "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id*.

*Grable* described removal is proper if a federal issue is "embedded"' within a state law claim. *Id.* at 308.  The federal issue must be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id*. at 313-14;  *Connecticut v. Exxon Mobil Corporation*, 2021 WL 2389739, at *7 (D.Conn. 2021).  Where all four of these requirements are met, jurisdiction is proper because there is a "serious federal interest in claiming the advantages thought to be inherent in a federal forum," which can be vindicated without disrupting Congress's intended division of labor between state and federal courts.  *Gunn*, 568 U.S. at 258.

### 1.   The Hoffnagle Complaint raises substantial questions of federal law.

The Hoffnagle complaint necessarily raises a federal issue disputed by the parties.  Under *Gunn* and *Grable*, "to necessarily raise a federal issue, a state law claim must hinge on the determination of a federal issue." *Burrell v. Bayer Corp*., 918 F.3d 372, 383 (4th Cir. 2019).  And the federal issue must be "actually disputed," or as described by *Gunn*, "the central point of dispute."  568 U.S. at 259.

In *Gunn*, plaintiff Minton brought a state-law legal malpractice claim against the law firm that failed to raise an argument in Minton's underlying patent infringement case.  *Gunn*, 568 at 259.  As part of the legal malpractice case, Minton would have to prove that he would have prevailed in his infringement case if the law firm had timely pressed that particular argument.  Minton had leased the product to a user;  more than a year later, his patent application was denied because the examiner found that the product had been "on sale" for over a year.  *Id*. at 254.  Minton alleged in his malpractice suit that the law firm should have argued the "experimental use" exception as a defense to the on-sale bar, which had been deemed waived because not timely raised.  *Id*.  On appeal, the Supreme Court of Texas concluded that Minton's claim involved "a substantial federal issue" sufficient to justify federal jurisdiction "because the success of Minton's malpractice claim is reliant upon the viability of the experimental use exception as a defense to the on-sale bar." *Id*. at 256.  The Supreme Court of the United States agreed: Minton's malpractice case turned on the application of patent law to determine whether the law firm had timely argued the experimental use exception.  *Id*. at 259;  *see also NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1029 (2d Cir. 2014) ("whether NASDAQ violated its duty to provide a fair and orderly market for the Facebook IPO … is not simply coincidental to UBS's state law claims; it is the duty on which the claims rest.").

As alleged in the Hoffnagle Complaint, CWC serves water contaminated with PFOA and PFOS "at levels deemed dangerous to human health by the current scientific understanding of PFAS chemicals as presented in peer-reviewed studies and relied upon by the EPA," Hoffnagle Complaint at ¶¶ 21-22.  Whether CWC violated its duty to serve water ---in an absence of any regulation prohibiting it from doing so --- and whether the levels were "dangerous to human health" is the central point in dispute.

To date, the Safe Drinking Water Act has not yet regulated levels of PFOA and PFOS. Nor does the Act prohibit a public water system from serving water that contains unregulated contaminants.  And when EPA does issue an MCL for either or both compounds, that regulatory standard is not a scientific judgment of "danger to human health."  As discussed above, an MCL is not driven solely by health concerns but also by the feasibility of compliance "taking cost into consideration." 42 U.S.C. § 300g-1.  The Hoffnagle plaintiffs seek a determination that public drinking water is "dangerous" when neither the federal nor state authorities have deemed it so.

Moreover, the Hoffnagle complaint raises a question regarding the scope of a public water system's duties to the public.  When that system is in full compliance with regulations, can state tort claims impose a higher duty on that system?  Thus, determination of the state-law tort claims hinges on the determination of CWC's duties under the Safe Drinking Water Act.

This Court has found that a complaint stating state-law product liability claims "necessarily raises a federal issue that is disputed by the parties" where the allegedly defective medical device at issue implicates federal standards, regulations and approval requirements relevant to medical devices.  *Boehringer v. Smith & Nephew, Inc*., 2018 WL 4735718, at *3 (D.Conn., 2018);  *Mihok v. Medtronic, Inc.*, 119 F.Supp.3d 22, 28 (D.Conn., 2015) (where device manufacturer disputes that it violated federal safety standards, the plaintiff's complaint

"necessarily raises a federal issue which the parties actually dispute); *cf. West Virginia State University Board of Governors v. Dow Chemical Company*, 23 F.4th 288, 382 (4th Cir. 2022) ("If, on the other hand, the plaintiff 'can establish all the necessary elements entirely independently of federal law, a federal issue is not necessarily raised.").

  **2.  The Hoffnagle Complaint raises a federal issue that is actually disputed.**

  Whether CWC can be held liable under state law for serving water that is "dangerous to human health," although in compliance with federal and state law, is the central point in dispute. On the one hand, EPA has no power to require any action from CWC because its water complies with federal law.  On the other hand, however, is the possibility that state law can impose liability on CWC *for complying with federal law*.  "The federal issue is also "actually disputed" here—indeed, on the merits, it is the central point of dispute." *Gunn*, 568 U.S. at 259.

  The Supreme Court articulated the level of dispute necessary to support federal jurisdiction in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg*., 125 S.Ct. 2363, 2366, 545 U.S. 308, 310–11 (U.S., 2005).  After the Internal Revenue Service seized real property belonging to Grable & Sons Metal Products, Inc., to satisfy Grable's federal tax delinquency, Grable later brought a quiet title action in state court against Darue, the new owner of the property.  In that action Grable claimed that Darue's title was invalid because the IRS had failed to notify Grable of its seizure of the property in the exact manner required by Internal Revenue Code § 6335(a), which requires personal service, not service by certified mail.  *Id*. Darue removed the case to Federal District Court as presenting a federal question, because the claim of title depended on the interpretation of the notice statute in the federal tax law.  *Id*. at 311.

  The Supreme Court agreed that the case warranted federal jurisdiction:

> Whether Grable was given notice within the meaning of the federal
> statute is thus an essential element of its quiet title claim, and the
> meaning of the federal statute is actually in dispute; it appears to be
> the only legal or factual issue contested in the case.

*Id*. at 315.

The same dispute exists here.  CWC is in full compliance with SDWA.  The Hoffnagle

Complaint's allegations of CWC's duty to consumers disputes the propriety, application, and

scope of the standards determined by SDWA.  CWC will argue that its compliance with SDWA

protects it from tort liability;  the class plaintiffs will argue that it does not.  *Gunn* recognized this

plaintiff-says defendant-says dispute as "just the sort of dispute respecting the effect of [federal]

law that *Grable* envisioned."  568 U.S. at 259;  *Mihok*, 119 F.Supp.3d at 28 (where plaintiff

alleged violation of federal safety standards for medical devices, and device maker disputes those

allegations, an actual dispute exists).

**3.      The federal issue here is substantial.**

The Supreme Court has found a federal issue to be "substantial" where a state court case

raised questions concerning the construction and validity of federal statutory law and could have

national consequences.  *Mihok*, 119 F.Supp.3d at 28.  It is not enough that the federal issue be

significant to the particular parties in the immediate suit; rather, "substantiality ... looks to the

importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 259;  *NASDAQ*

*OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1024 (2d Cir. 2014).

The *Grable* analysis of the IRS provision found this requirement satisified:

> The meaning of the federal tax provision is an important issue of
> federal law that sensibly belongs in a federal court. The
> Government has a strong interest in the "prompt and certain
> collection of delinquent taxes," United States v. Rodgers, 461 U.S.
> 677, 709, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983), and the ability of
> the IRS to satisfy its claims from the property of delinquents
> requires clear terms of notice to allow buyers like Darue to satisfy
> themselves that the Service has touched the bases necessary for

good title. The Government thus has a direct interest in the availability of a federal forum to vindicate its own administrative action, and buyers (as well as tax delinquents) may find it valuable to come before judges used to federal tax matters. Finally, because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor.

*Id*. at 315.

Here, the federal government has a strong interest in regulating public drinking water supplies and in ensuring that those regulations are feasible so that water providers can continue to operate.  EPA also has a strong interest in the compliance of public water systems with its drinking water regulations and the ability of those public water systems to know that they are in compliance.  The instant case raises a substantial federal issue because the meaning of the SDWA and EPA's decisions themselves in dispute.

The SDWA requires the EPA to publish drinking water regulations, provides an elaborate enforcement scheme, and allows for citizen suits to enforce SDWA regulations.  *See generally* 42 U.S.C. § 300g-3(b), (g)(1).  "Hence, 'the SDWA evinces a clear congressional intention to entrust the regulation of public drinking water systems to an expert regulatory agency rather than the courts.'" *Mattoon v. City of Pittsfield*, 980 F.2d 1, 4-5 (1st Cir. 1992).  The SDWA charges EPA with the responsibility of determining appropriate regulations for drinking water that consider the statutorily-required factors of feasibility and cost in addition to risks to public health.

Critically, a decision regarding public water systems' duty in the instant case would affect each of the thousands of public water systems in the United States.  A determination here that CWC's compliance with the SDWA does not protect it from state tort claims "would likely have far-reaching prospective consequences for the operation of" public water systems.  *See*

*NASDAQ OMX Group, Inc.*, 770 F.3d at 1028.  Because the state law claims at issue implicate federal standards promulgated by EPA pursuant to SDWA, such a decision should be made in a federal forum to avoid undermining "the development of a uniform body of [public water system duty] law." *See Gunn*, 568 U.S. at 261.

      **4.**      **The Hoffnagle Complaint is capable of resolution in federal court without disrupting the federal-state balance.**

In fact, the Hoffnagle Complaint would benefit greatly by consolidation with other similar cases pending in the MDL.  And the MDL process itself is intended to preserve the federal-state balance by resolving only pretrial matters in federal court before remanding cases to their original jurisdictions for trial.  MDL 2873 provides an appropriate forum for the Hoffnagle Complaint.  Not only has Judge Gergel devoted hundreds of hours to learning the theories of liability, the AFFF Manufacturers' defenses, and the science supporting claims of property damage and personal injury, he has organized an extremely efficient means of resolving categories of cases in an orderly manner.

As alleged by the Hoffnagle Complaint, the class advances substantially similar claims to those alleged by almost all other plaintiffs in the MDL.  Convenience, judicial economy, and justice are served by litigating these issues in the same court.  As described in the Panel's recent transfer order, the *Broy* consumers' action alleging harm caused by PFAS against the City of Corona substantially overlapped with the City's claim against the AFFF Manufacturers:

> Plaintiffs seek to represent a putative class of all persons within the City of Corona who were exposed to the PFAS allegedly contaminating the City's water supply. Unlike the *City of Corona* complaint, the *Broy* complaint does not contain any allegations relating to AFFFs. But plaintiffs' claims in *Broy* substantially overlap with the claims in *City of Corona* and necessarily will involve common questions of fact regarding, for instance, the nature of the alleged PFAS contamination and its source(s).

> Plaintiffs' arguments to the contrary are not persuasive. Their own water provider is alleging that the water contamination at issue in both *Broy* and *City of Corona* was caused, at least in part, by AFFFs. Regardless of how plaintiffs characterize their complaint, these actions are sufficiently intertwined that transfer is necessary to avoid duplicative discovery and pretrial proceedings.

*See* Transfer Order, *In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2873 (Doc. 1927), attached.

Moreover, this matter is destined for transfer to the MDL: CWC could simply implead the AFFF Manufacturers, who would then remove the case to federal court and tag it for transfer to the MDL.  Removal now avoids unnecessary delay and duplicative proceedings and moves all parties --- both CWC and the Hoffnagle plaintiffs --- into a forum where they can seek justice from the companies that created this national contamination problem.

## V.      CONCLUSION

Because the Hoffnagle complaint raises a substantial federal issue and involves common questions of fact with the actions previously transferred under 28 U.S.C. § 1407, removal here is proper and transfer to MDL No. 2873 will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

The Defendant
CONNECTICUT WATER COMPANY

Neal L. Moskow, Esq.
CT Federal No. ct04516MOSKOW LAW
GROUP, LLC
425 Kings Highway East
Fairfield, Connecticut 06825
Tel.  (475) 999-4177
Fax. (475) 999-4186
neal@moskowlaw.com
www.moskowlaw.com

*Counsel To be moved Pro Hac Vice:*

Scott Summy (TX Bar 19507500)
Carla Burke Pickrel (TX Bar 24012490)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181

*and*

Philip F. Cossich, Jr. (LA Bar 01788)
Christina Cossich (LA Bar 32407)
COSSICH, SUMICH, PARSIOLA
& TAYLOR, LLC
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110

# COMPLAINT

**SUMMONS - CIVIL**
JD-CV-1  Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA.* |
| --- |

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



Instructions are on page 2.

- [ ] Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.
- [x] Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.
- [ ] Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
| --- | --- | --- |
| 95 Washington Street, Hartford, CT 06106 | (860) 548 – 2700 | October 31, 2023 |

| [x] Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
| --- | --- | --- | --- | --- |
| [ ] Housing Session | [ ] Number: | Hartford | Major: T | Minor: 90 |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
| --- | --- |
| Ian W. Sloss, Esq., Silver Golub & Teitell LLP, One Landmark Sq., 15th Fl., Stamford, CT 06901 | 058005 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
| --- | --- |
| (203 ) 325 – 4491 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. [x] Yes [ ] No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* isloss@sgtlaw.com |
| --- | --- |

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
| --- | --- | --- |
| **First plaintiff** | Name: Hoffnagle, Frances <br> Address: 31 Wickhams Fancy, Collinsville, CT 06019 | P-01 |
| **Additional plaintiff** | Name: Monroe, Lori <br> Address: 27 Deborah Road, Windsor Locks, CT 06096 | P-02 |
| **First defendant** | Name: The Connecticut Water Company, 98 West Main Street, Clinton, Connecticut 06413 <br> Address: AGENT FOR SERVICE:   CT Corporation System, 67 Burnside Avenue, East Hartford, CT 06108-3408 | D-01 |
| **Additional defendant** | Name: <br> Address: | D-02 |
| **Additional defendant** | Name: <br> Address: | D-03 |
| **Additional defendant** | Name: <br> Address: | D-04 |

| Total number of plaintiffs: 3 | Total number of defendants: 1 | [x] Form JD-CV-2 attached for additional parties |
| --- | --- | --- |

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | [x] Commissioner of Superior Court | Name of person signing |
| --- | --- | --- | --- |
| 10/16/23 | | [ ] Clerk | Ian W. Sloss, Esq. |

| If this summons is signed by a Clerk: | For Court Use Only |
| --- | --- |
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. <br> b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. <br> c. The court staff is not permitted to give any legal advice in connection with any lawsuit. <br> d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | File Date <br><br> A TRUE COPY ATTEST <br><br> KEITH D. NIZIANKIEWICZ <br> CONNECTICUT STATE MARSHAL <br> INDIFFERENT PERSON |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date <br> 10/16/23 | Docket Number |
| --- | --- | --- | --- |

| Print Form | Page 1 of 2 | Reset Form |
| --- | --- | --- |

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2   Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*
**Hoffnagle, Frances**

First named Defendant *(Last, First, Middle Initial)*
**The Connecticut Water Company**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| **Tracy, Carla**<br>**5 Weymouth Dr, Enfield, CT 06082** | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |

| | | FOR COURT USE ONLY - File Date |
|---|---|---|
| | 12 | |
| | 13 | |
| | 14 | Docket number |

**CIVIL SUMMONS-Continuation**

 Print Form          Reset Form

RETURN DATE:     OCTOBER 31, 2023      :     SUPERIOR COURT
                                       :
FRANCES HOFFNAGLE, LORI MONROE,        :     JUDICIAL DISTRICT OF
and CARLA TRACY, individually and on   :     HARTFORD
behalf of all others similarly situated, :
                                       :
V.                                     :     AT HARTFORD
                                       :
THE CONNECTICUT WATER COMPANY          :     OCTOBER 16, 2023

## COMPLAINT

1.      Plaintiffs Carla Tracy, Lori Monroe, and Frances Hoffnagle (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against defendant The Connecticut Water Company ("Defendant" or "CWC") based upon the investigation of Plaintiffs' counsel, information and belief, personal knowledge, and a review of publicly available information.

2.      Plaintiffs bring this class action against defendant CWC pursuant to the Connecticut Product Liability Act, CONN. GEN. STAT. § 52-572m, *et seq.* and the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a, *et seq.*, on behalf of all persons who were customers of CWC who received water from CWC (the "Water" or "Product") contaminated with detectable levels of PFAS Chemicals during the relevant statutory period (the "Class Period") and who were damaged as a result (the "Class").

## PARTIES

A.      **PLAINTIFFS**

3.      Plaintiff Frances Hoffnagle is a resident of Collinsville, Connecticut. Plaintiff Hoffnagle is a current customer of defendant CWC, purchased water from defendant CWC during the Class Period, and ingested water purchased from defendant CWC during the Class Period.

4.      Plaintiff Lori Monroe is a resident of Windsor Locks, Connecticut. Plaintiff Monroe is a current customer of defendant CWC, purchased water from defendant CWC during the Class Period, and ingested water purchased from defendant CWC during the Class Period.

5.      Plaintiff Carla Tracy is a resident of Enfield, Connecticut. Plaintiff Tracy is a current customer of defendant CWC, purchased water from defendant CWC during the Class Period, and ingested water purchased from defendant CWC during the Class Period.

**B.      DEFENDANT**

6.      Defendant The Connecticut Water Company is a corporation formed and existing under the laws of the State of Connecticut, with its principal office located at 93 West Main Street, Clinton, Connecticut 06413.

7.      CWC is an investor-owned utility that owns and operates multiple public water supply systems in 60 towns in Connecticut, serving approximately 350,000 people, including Plaintiffs and members of the Class. At all times mentioned herein, defendant CWC manufactured, distributed, and marketed drinking water contaminated with detectable levels of PFAS in Connecticut to Plaintiffs and members of the Class.

**SUBSTANTIVE ALLEGATIONS**

**I.      PERFLUORINATED ALKYLATED SUBSTANCES ARE HAZARDOUS TO HUMAN HEALTH**

8.      Perfluorinated Alkylated Substances ("PFAS Chemicals" or "PFAS") are artificial chemicals resistant to, *inter alia*, biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

9.      PFAS Chemicals' resistance to these (and other) forces causes them to persist in the environment for long (if not indefinite) periods of time, earning them the nickname "forever chemicals."

2

10. Thousands of PFAS Chemicals have been developed and produced, but the two most widely used PFAS Chemicals are Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS").

11. PFOA and PFOS were developed in the 1940's and 1950's and have been added to and/or used in products such as metal coatings, clothing, furniture, adhesives, food packaging, paper products, heat-resistant non-stick cooking surfaces, insulation of electrical wire, and many other products due to PFOA's and PFOS's ability to repel water, dirt, oil, and grease, resist heat, and protect surfaces.

12. PFAS Chemicals are water soluble: once PFAS Chemicals enter a body of water, they easily spread throughout the body of water or water system and remain unless and until the PFAS Chemicals are actively removed. As a result, drinking water contamination is a common way people are exposed to PFAS Chemicals.

13. PFOS and PFOA accumulate in humans' blood and organs, including kidneys and the liver, and interfere with the human body's functions, including the functions of organs and immune systems, leading to adverse health outcomes.

14. Peer-reviewed studies reflecting the most recent and best scientific understanding of PFAS Chemicals' impact on human health consider *any* amount of PFAS Chemical exposure, including exposure to PFOS and PFOA, to be hazardous to human health. In fact, negative health effects may occur because of exposure to PFOA or PFOS in drinking water at levels near zero and below most laboratories' ability to detect at this time. In other words, exposure to a detectable amount of PFAS Chemicals, including PFOA and PFOS, is hazardous to human health.

15. The following is a non-exhaustive list of adverse human health outcomes that can result from exposure to PFOS and PFOA, many of which can manifest years after exposure: (1)

3

reproductive effects such as decreased fertility or increased high blood pressure in pregnant women; (2) developmental effects or delays in children, including low birth-weight, accelerated puberty, bone variations, or behavioral changes;  (3) increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, breast cancer, ovarian cancer; (4) reduced ability of the body's immune system to fight infections, including reduced vaccine response;  (5) interference with the body's natural hormones and  liver enzymes; (6) increased cholesterol levels and/or risk of obesity; (7) changes in liver enzymes; (8) increased risk of high blood pressure or pre-eclampsia in pregnant women; (9)interference with; and (10) suppression of vaccine response (decreased serum antibody concentrations) in children.

16.     PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

17.     PFOS has additionally been observed to cause potentially human relevant tumors, including hepatocellular tumors in male and female rats and pancreatic islet cell carcinomas in male rats.

## II.     CONNECTICUT   WATER   COMPANY   IS   KNOWINGLY   PROVIDING CONNECTICUT   RESIDENTS   WITH   UNSAFE,   PFAS-CONTAMINATED DRINKING WATER.

18.     The Connecticut Water Company ("CWC") is an investor-owned Connecticut company that operates a public drinking water system in Connecticut that serves "more than 105,000 customers" or "about 350,000 people, in 60 towns[.]"

19.     CWC has detected PFOA, PFOS, and other PFAS Chemicals in bodies of water and wells CWC uses as the source for Water served to customers such as Plaintiffs and members of the Class since at least 2019.

20. For example, CWC's most recent Water test results from 2022, which are set forth below in a town-by-town 2022 Annual Water Quality Report, show elevated levels of PFAS—including specifically PFOS and PFOA—in the Water that CWC supplies to a number of Connecticut towns, Plaintiffs, and members of the Class:

| Town (System) | PFOA (ppt) | PFOS (ppt) | PFNA (ppt) | PFHXS (ppt) | PFHpA (ppt) | PFBS (ppt) |
|---|---|---|---|---|---|---|
| Avon (Collinsville) | 7 | 14 | 3 | 3 | 2.1 | 2 |
| Avon (Unionville) | 6 | 5 | - | 4 | 3 | - |
| Avon (Avon) | 7 | 14 | 3 | 3 | 2.1 | 2 |
| Brooklyn (Crystal) | 9 | 9 | - | 7 | 2 | 3 |
| Burlington (Collinsville) | 7 | 14 | 3 | 3 | 2.1 | 2 |
| Canton (Collinsville) | 7 | 14 | 3 | 3 | 2.1 | 2 |
| Clinton (Guilford) | 5 | 13 | - | 6 | - | 6 |
| Coventry (Coventry Hills) | - | 2 | - | - | - | - |
| Coventry (General Water) | 3.8 | 2.49 | - | 2.23 | - | 5 |
| Coventry (Lakeview) | 2.3 | 9.85 | - | 5.24 | - | 2.54 |
| Coventry (Nathan Hale) | - | 3.18 | - | 5.46 | - | 4.83 |
| Coventry (Pilgrim Hills) | 4 | - | - | - | - | 2 |
| East Granby (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| East Hampton (Westchester East) | 3.44 | 4.32 | - | - | - | 2.3 |
| East Windsor (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| Ellington (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| Enfield (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |

| Town (System) | PFOA (ppt) | PFOS (ppt) | PFNA (ppt) | PFHXS (ppt) | PFHpA (ppt) | PFBS (ppt) |
|---|---|---|---|---|---|---|
| Farmington (Unionville) | 6 | 5 | - | 4 | 3 | - |
| Farmington (Avon) | 7 | 14 | 3 | 3 | 2.1 | 2 |
| Griswold (Country Mobile Estates) | 4 | 7 | - | 2 | - | 2 |
| Guilford (Guilford) | 5 | 13 | - | 6.1 | - | 6 |
| Hebron (Hebron Center) | 2 | 5 | - | - | - | - |
| Hebron (London Park) | 6.02 | 6.75 | - | 2.1 | - | 3.52 |
| Killingly (Crystal) | 9 | 9 | - | 7 | 2 | 3 |
| Madison (Green Springs) | 4.88 | 3.68 | - | - | - | 3.52 |
| Madison (Guilford) | 5 | 13 | - | 6.1 | - | 6 |
| Madison (Legend Hill) | 4 | - | - | - | - | 2 |
| Mansfield (Birchwood Heights) | 2.24 | 5.27 | - | - | - | - |
| Marlborough (Forest Homes) | 7 | 7 | - | 4 | - | - |
| Marlborough (Marlborough Gardens) | 9.61 | 8.52 | - | 2.88 | 2.77 | 6.73 |
| Old Lyme (Miami Beach) | 14 | 16 | - | 3.6 | 7.7 | 3.6 |
| Old Saybrook (Guilford) | 5 | 13 | - | 6.1 | - | 6 |
| Plainfield (Gallup) | 4.44 | 3.57 | - | - | - | 2 |
| Somers (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| South Windsor (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| Suffield (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| Tolland (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| Vernon (Reservoir Heights) | 7 | 6 | - | 2 | 2 | 3 |

| Town (System) | PFOA (ppt) | PFOS (ppt) | PFNA (ppt) | PFHxS (ppt) | PFHpA (ppt) | PFBS (ppt) |
|---|---|---|---|---|---|---|
| Vernon (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |
| Westbrook (Guilford) | 5 | 13 | - | 6.1 | - | 6 |
| Windsor Locks (Northern-Western) | 10 | 8 | - | 3 | 2 | 3 |

21. Specifically, the 2022 test results shown above demonstrate that the Water CWC has and continues to serve to customers (such as Plaintiffs) located in dozens of cities and towns in Connecticut is contaminated with PFOA at levels deemed dangerous to human health by the current scientific understanding of PFAS Chemicals as presented in peer-reviewed studies and relied upon by the EPA: (1) Old Lyme/Miami Beach; (2) East Granby/Northern-Western; (3) East Windsor/Northern-Western; (4) Ellington/Northern-Western; (5) Enfield/Northern-Western; (6) Somers/Northern-Western; (7) South Windsor/Northern-Western; (8) Suffield/Northern-Western; (9) Tolland/Northern-Western; (10) Vernon/Northern-Western; (11) Windsor Locks/Northern-Western; (12) Marlborough/Marlborough Gardens; (13) Killingly/Crystal; (14) Brooklyn/Crystal; (15) Avon/Collinsville; (16) Avon/Avon; (17) Burlington/Collinsville; (18) Canton/Collinsville; (19) Farmington/Avon; (20) Marlborough/Forest Homes; (21) Vernon/Reservoir Heights; (22) Hebron/London Park; (23) Farmington/Unionville; (24) Avon/Unionville; (25) Clinton/Guilford; (26) Guilford/Guilford – 5 ppt; (27) Madison/Guilford; (28) Old Saybrook/Guilford; and (29) Westbrook/Guilford.

22. Additionally, the 2022 CWC test results demonstrate that the Water CWC serves to customers (including Plaintiffs) located in at least 23 towns and/or cities in Connecticut is contaminated with PFOS at levels deemed dangerous to human health by the current scientific understanding of PFAS Chemicals as presented in peer-reviewed studies, including: (1)

7

Coventry/Lakeview; (2) Brooklyn/Crystal; (3) Killingly/Crystal; (4) Marlborough/Marlborough Garden; (5) Windsor Locks/Northern-Western; (6) East Granby/Northern-Western; (7) East Windsor/Northern-Western; (8) Ellington/Northern-Western; (9) Enfield/Northern-Western; (10) Somers/Northern-Western – 8 ppt; (11) South Windsor/Northern-Western; (12) Suffield/Northern-Western; (13) Tolland/Northern-Western; (14) Vernon/Northern-Western; (15) Windsor Locks/Northern-Western; (16) Griswold/Country Mobile Estates; (17) Marlborough/Forest Homes; (18) Hebron/London Park; (19) Vernon/Reservoir Heights; (20) Mansfield/Birchwood Heights; (21) Avon/Unionville; (22) Farmington/Unionville; and (23) Hebron/Hebron Center.

23.   CWC's PFAS test results from prior years have shown similar results, yet CWC has failed to remedy the problem. That is, CWC has been supplying dozens of Connecticut towns and/or cities with Water CWC knows is contaminated with detectable levels of PFAS Chemicals.

24.   CWC itself acknowledges on its website that "even low levels [of PFAS] in drinking water can be a health risk if exposure is long term;" and because "PFOA and PFOS are persistent in the human body and resistant to metabolic degradation," even "short-term exposure can result in a body burden that persists for years and can increase with additional exposures."

25.   Therefore, CWC knows that Water coming from sources with *any* detectable level of PFOA and/or PFOS poses a danger to its customers.

Despite this knowledge, CWC has not taken adequate action to reduce PFAS Chemical contamination levels to non-detectable levels in its water sources. Instead, CWC has continued serving Water contaminated with detectable PFAS levels to Plaintiffs and members of the Class throughout Connecticut.

III.   **EFFECTIVE TREATMENT METHODS EXIST TO ELIMINATE PFAS CONTAMINATION FROM DRINKING WATER.**

26.     There are several effective methods to treat and/or remediate PFAS contamination of drinking water down to non-detectable levels.

27.     Activated Carbon Treatment. Activated carbon treatment is the most common and most studied treatment for PFAS removal. Activated carbon is commonly used to adsorb organic compounds in drinking water treatment systems. Adsorption is a process of accumulating a substance, such as PFAS, at the interface between liquid and solid phases. Activated carbon is an effective adsorbent because it is a highly porous material and provides a large surface area to which contaminants may adsorb. Activated carbon is made from organic materials with high carbon contents such as wood, lignite, and coal; and is often used in granular form called granular activated carbon (GAC). GAC has been shown to effectively remove PFAS from drinking water when it is used in a flow-through filter mode after particulates have already been removed from the water via conventional sand filtration, or a similar process. According to the research, GAC can be 100 percent effective for a period of time, depending on the specific PFAS that needs to be removed, the type of carbon used, the depth of the bed of carbon, flow rate of the water, temperature, and the degree and type of organic matter as well as the presence of other contaminants, or constituents, in the water.

28.     Ion Exchange Treatment. Ion Exchange Treatment involves the use of resins made of highly porous, insoluble polymeric materials which act like magnets that attract and remove PFAS. There are two broad categories of ion exchange resins: cationic and anionic. The negatively-charged cationic exchange resins (CER) are effective for removing positively charged contaminants, and positively-charged anion exchange resins (AER) are effective for removing negatively-charged contaminants, like PFAS. Ion exchange resins are like tiny powerful magnets

9

that attract and hold the contaminated materials from passing through the water system. Negatively charged ions of PFAS are attracted to the positively charged anion exchange resins. AER has shown to have a high removal capacity for many PFAS; however, it is typically more expensive than GAC. Of the different types of AER resins, perhaps the most promising are the PFAS-selective class of AER in a single use mode. Because this treatment technology does not need resin regeneration, there is no liquid contaminant waste stream from the regeneration process to consider, but the spent resin will need to be managed by either disposal or incineration. Like GAC, AER removes 100 percent of the PFAS for a time that is dictated by the type of PFAS that needs to be removed, the choice of resin, bed depth, flow rate, and the degree and type of background organic matter and other contaminants or constituents.

29.    Reverse Osmosis (High Pressure Membrane) Treatment. Evidence shows that the use of high-pressure membrane treatments such as reverse osmosis is an extremely effective way to remove PFAS. Reverse osmosis is typically more than 90 percent effective at removing a wide range of PFAS, including shorter chain PFAS.  With both high-pressure membrane types, approximately 80 percent of the feed water (the water coming into the membrane) passes through the membrane to the effluent (the treated water). Approximately 20 percent of the feed water is retained as a high-strength concentrated waste. A high-strength waste stream can be difficult to treat or dispose, especially for a contaminant such as PFAS. This technology may be best suited as a point-of-use technology for a homeowner, since the volume of water being treated is much smaller and the waste stream could be disposed of down the drain with less cause for concern. Use of high-pressure membranes used at the point-of-entry to a home or building may have a waste disposal problem because it is treating all the water used in that building and the waste stream will have a similarly higher flow rate. Also, high pressure membranes produce a treated water that is

10

corrosive, and care must be taken (as is done at water utilities) to make sure this doesn't result in metal (lead and copper) corrosion of the building's premise plumbing and fixtures.

30.     To date, defendant CWC has not utilized any of the above-mentioned treatment systems to ensure its Water is not contaminated with detectable levels of PFAS Chemicals.

## IV.     CONNECTICUT WATER COMPANY KNOWS ITS WATER POSES A THREAT TO THE HEALTH OF ITS CUSTOMERS

31.     CWC knows that the presence of detectable levels of PFAS Chemicals in its Water poses a threat to the health of its customers, including Plaintiffs and members of the Class.

32.     For example, on October 20, 2021, CWC filed a lawsuit against the manufacturers of several PFAS Chemicals seeking compensation for (i) violation of Connecticut's Products Liability Act (CPLA) on theories of strict liability, negligence, and failure to warn, (ii) private and public nuisance, and (iii) trespass to land – seeking damages and remediation costs in connection therewith. *See Conn. Water Co. v. 3M Company*, No. 2:21-cv-03949 (D.S.C.) (J. Rengel) (the "3M Action").

33.     CWC's complaint filed in the 3M Action alleges, *inter alia*, that:

a)   "Human exposure to PFOA is associated with an increased risk of kidney and testicular cancer, and ulcerative colitis, among other conditions. Human exposure to PFOA and PFOS is associated with an increased risk of immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, and other adverse health conditions."

b)   "[PFOS and PFOA] compounds entered into critical sources of water relied upon by [CWC] to supply its customers, thereby contaminating [CWC]'s Property."; and

11

c) "[CWC] seeks to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from *continuous and ongoing contamination* of Plaintiff's [wells, water sources and supply, and delivery system infrastructure, including any treatment systems]." (emphasis added); and

d) "[A]ny detectable level of PFOA and/or PFOS in its groundwater source, well water, or elsewhere on its property requires investigation, treatment, remediation and continued monitoring."

34.    CWC thus knew, or reasonably should have known, that PFAS Chemicals are toxic, harmful to human health, resist natural degradation, render drinking water unsafe and/or non-potable, and are capable of being removed from public drinking water supplies if proper action is taken.

35.    Despite CWC's knowledge, CWC has continued to manufacture, market, and sell PFAS-contaminated Water to Plaintiffs and members of the Class and—in an apparent attempt to avoid costs—has not undertaken *any* of the above-discussed treatment options, or other options capable of reducing PFAS Chemical concentrations in the Water to non-detectable levels.

36.    Instead, CWC has chosen to pass on PFAS-contaminated Water to its customers, putting the health of Plaintiffs and members of the Class at risk, contaminating their bodies and properties.

## V.    **CWC'S CONDUCT HARMED PLAINTIFFS AND MEMBERS OF THE CLASS.**

37.    Plaintiffs and members of the Class bought Water from CWC that was contaminated with unsafe levels of PFAS Chemicals, including PFOA and PFOS, and ingested that Water, which was one of the Water's intended uses.

12

38.     Plaintiffs and members of the Class were thus damaged when they overpaid for CWC Water. That is, Plaintiffs and members of the Class paid more than they otherwise would have for a product—CWC's Water—that was contaminated with unsafe levels of PFAS chemicals and was thus unfit for its intended use.

39.     Plaintiffs and members of the Class have additionally been damaged by their exposure to unsafe levels of PFAS Contamination via ingestion of the PFAS-contaminated Water provided by CWC. As a result of the PFAS Chemical exposure caused by ingestion and use of CWC's Water, PFAS Chemicals, including PFOA and PFOS, have accumulated in the blood and bodily tissue of Plaintiffs and members of the Class. As a result of the PFAS Chemical exposure and accumulation of PFAS Chemicals in their bodies, Plaintiffs and members of the Class are at increased risk of developing adverse health conditions.

40.     Accordingly, Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) for the harm caused by CWC's wrongful conduct, as further detailed herein.

## CLASS ALLEGATIONS

41.     Plaintiffs bring this action as a class action pursuant to the Connecticut Rules for the Superior Court, Conn. Practice Book Secs. 9-7 and 9-8.

42.     Plaintiffs seek class certification of a Class defined as follows:

> All citizens of Connecticut who bought Water contaminated with detectable levels of PFAS Chemicals (as defined above) from CWC during the Class Period (the "Class").

43.     Plaintiffs reserve the right to modify or refine the definitions of the Class or add subclasses based upon discovery of new information.

44.     Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) defendant CWC and defendant CWC's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which defendant CWC or its parents have a controlling interest, as well as defendant CWC's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and defendant CWC; and (f) the legal representatives, successors, and assigns of any such excluded persons.

45.     Ascertainability. The proposed Class is readily ascertainable because it is defined using objective criteria which allow class members to determine if they are a member of the Class. Further, the Class can be readily identified through records maintained by defendant CWC.

46.     Numerosity. The Class is so numerous that joinder of individual members herein is impracticable. There are hundreds of thousands of individuals and entities that purchased Water from defendant CWC who have been damaged.

47.     Commonality. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including:

    a) Whether CWC's design, manufacture, and/or sale of the Water was unreasonably dangerous;

    b) Whether CWC has failed to warn and/or adequately instruct regarding the dangers that can result from exposure to and/or use of the Water;

    c) Whether CWC's conduct was negligent;

14

d)   Whether CWC owed a duty of care to Plaintiffs and member of the Class to supply safe drinking water free of dangerous contaminants;

e)   Whether defendant CWC breached its duty to warn Plaintiffs and members of the Class of, and protect Plaintiffs and members of the Class from, the long-term health risks and consequences of exposure to high levels of PFAS;

f)   Whether the PFAS contamination of the Product described herein substantially interfered with the Plaintiffs' and members of the Class's use and enjoyment of their property;

g)   Whether CWC's conduct constitutes unfair and/or deceptive acts Or practices;

h)   Where CWC was unjustly enriched as a result of its conduct;

i)   Whether CWCs' acts and omissions constitute a knowing, willful, and/or reckless disregard for the health and safety of Connecticut residents, including Plaintiffs and members of the Class; and

j)   Whether medical monitoring and early detection will provide benefits to Plaintiffs and members of the Class.

48.   Typicality. Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Plaintiffs and members of the Class suffered injuries as a result of defendant CWC's wrongful conduct that is uniform across the Class.

49.   Adequacy. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the

15

Class, and defendant CWC has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting the Action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class.

50.     <u>Substantial Benefits</u>. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and defendant CWC, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

51.     Class certification, therefore, is appropriate under Conn. Practice Book Sec. 9-7 and 9-8 because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

52.     Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## COUNTS

FIRST COUNT:    VIOLATION OF THE CONNECTICUT PRODUCT LIABILITY ACT, CONN. GEN. STAT. § 52-572m, *et seq.*

53.     Plaintiffs and the members of the Class re-allege and incorporate the allegations set forth above.

54.     At all relevant times, CWC was a "Product Seller" and a "Manufacturer" as to the Water it sold to Plaintiffs and the members of the Class within the meaning of the CPLA. *See* CONN. GEN. STAT. § 52-572m(b), (e).

### A.     CPLA – STRICT LIABILITY

55.     At all relevant times herein, defendant CWC manufactured, sold, and distributed a defective product (the Water) to Plaintiffs and members of the Class.

56.     The presence of detectable levels of PFAS Chemicals, including PFOA and PFOS in drinking water and the human body poses an inherent and extraordinary threat to human health and well-being by threatening to expose the human body to PFAS Chemicals via the ingestion of drinking water, its intended use.

57.     Therefore, because the Water contained detectable (and therefore dangerous) concentrations of PFAS Chemicals, including PFOA and PFOS, the Water was and remains dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it.

58.     The accumulation of PFAS Chemicals in the bodies of Plaintiffs and members of the Class was a probable and foreseeable consequence of defendant CWC's design, manufacture, and sale of the defective PFAS-contaminated Water to Plaintiffs and members of the Class.

59.     Defendant CWC is therefore strictly liable to Plaintiffs and members of the Class for the harm caused to them by defendant CWC's design, manufacture, and sale of the defective PFAS-contaminated Water.

**B.     CPLA – NEGLIGENCE**

60.     As a Product Seller and/or Manufacturer as defined by the CPLA, defendant CWC had a duty of reasonable care to avoid selling Water contaminated with detectable, unsafe levels of PFAS to its customers, which include Plaintiffs and members of the Class.

61.     As known customers of CWC, Plaintiffs and members of the Class were within the scope of the risk created by CWC's conduct and were the foreseeable victims of negligent manufacture and design of the PFAS-contaminated Water.

62.     Defendant CWC owed its customers, including Plaintiffs, members of the Class, and other foreseeable users a duty of reasonable care to eliminate and/or minimize to non-detectable levels the PFAS concentration in the Water CWC sold to Plaintiffs and members of the Class.

63.     Defendant CWC breached its duty to use reasonable care in one or more of the following ways:

a) By failing to prevent the contamination of water sources used to supply Water to customers with detectable levels of PFAS;

b) By failing to cease manufacturing, selling, and/or distributing PFAS-contaminated Water after learning the Water contaminated with detectable levels of PFAS;

c) By failing to employ adequate filtration and/or treatment methods to eliminate PFAS or reduce the PFAS concentration of the Water to non-detectable levels;

d) By manufacturing, producing, distributing, and/or selling Water without adequately ensuring the Water did not contain detectable levels of PFAS contamination;

e) By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the contamination of the sources of the Water with PFAS;

f) By negligently failing to promptly and effectively respond to its release of PFAS Chemicals into the sources of CWC's Water;

g) By negligently failing to warn its customers, including Plaintiffs and members of the Class, that they were being exposed to dangerous levels of PFAS and the consequent risks of disease the residents acquired because of that exposure.

64.     As a direct and proximate cause of CWC's negligence, Plaintiffs and members of the Class have suffered, presently suffer, and will continue to suffer, *inter alia*, out of pocket expenses, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

65.     Defendant CWC is thus liable to Plaintiffs and members of the Class for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

C.    **CPLA – FAILURE TO WARN**

66.    As a Product Seller and/or Manufacturer as defined by the CPLA, defendant CWC had a duty to adequately warn foreseeable users of its Water, including Plaintiffs and members of the Class, of the dangers posed by the PFAS-contaminated Water CWC sold to Plaintiffs and members of the Class.

67.    Defendant CWC developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied the PFAS-contaminated Water for sale and sold the PFAS-contaminated Water to Plaintiffs for ingestion and consumption.

68.    Plaintiffs and members of the Class utilized the Water supplied by defendant CWC in a reasonably foreseeable and intended manner.

69.    The Water sold by defendant CWC was unreasonably dangerous to surrounding community residents, including Plaintiffs and members of the Class, without adequate warnings and instructions relating to prevent the accumulation inside the bodies of Plaintiffs and members of the Class and the increased risk of development of adverse health conditions resulting therefrom.

70.    Defendant CWC knew or should have known that the PFAS-contaminated Water CWC sold would be ingested and would accumulate in bodies, including the blood serum and bodily tissues of individuals who ingested the Water, including Plaintiffs and members of the Class.

71.    Defendant CWC failed to advise Plaintiffs, members of the Class, and those foreseeably exposed to defendant CWC's PFAS-contaminated Water about the risk that ingesting CWC's PFAS-contaminated Water  would result in accumulation of PFAS Chemicals in bodies, including the blood serum and bodily tissues of individuals who ingested the Water, nor did CWC adequately inform individuals of techniques that could be employed to reduce or eliminate these risks.

72.     Defendant CWC had actual knowledge of the health hazards that can result from exposure to PFAS Chemicals and CWC's PFAS-contaminated Water but failed to share such information with the Plaintiffs and members of the Class who were foreseeably exposed to their Water.

73.     Defendant CWC acted with reckless indifference to the health and safety of residents in surrounding communities where its PFAS-contaminated Water was sold and ingested by failing to provide adequate warnings of the known dangers of the PFAS-contaminated Water when ingested by Plaintiffs and members of the Class.

74.     As a direct and proximate result of defendant CWC's acts and omissions, Plaintiffs and members of the Class suffered, presently suffer, and will continue to suffer damages.

**D.     CPLA – NEGLIGENT DESIGN AND MANUFACTURE**

75.     As a Product Seller and/or Manufacturer as defined by the CPLA, defendant CWC engaged in testing, developing, designing, marketing, distributing, manufacturing, promoting, and selling the Water bought and ingested by Plaintiffs and members of the Class.

76.     As a Manufacturer pursuant to the CPLA, defendant CWC had a duty to make and sell Water which was reasonably fit, suitable, and safe for its intended and/or foreseeable uses.

77.     CWC owed that duty to: (1) direct purchasers of the Water such as Plaintiffs, (2) reasonably foreseeable users of the Water, and (3) any person who might reasonably be expected to otherwise ingest or consume the Water.

78.     Defendant CWC's Water was used in a reasonably foreseeable manner and without substantial change in the condition thereof by Plaintiffs and members of the Class, and the Water was defective and unfit for its reasonable use.

79.     At the time defendant CWC manufactured and distributed the Water purchased and ingested by Plaintiffs, defendant CWC knew of the defective and unreasonably dangerous condition of the Water it manufactured and distributed.

80.     Defendant CWC therefore knew or should have known that use of the Water by Plaintiffs and members of the Class would result in exposure of Plaintiffs and members of the Class to unsafe, dangerous concentration of PFAS Chemicals.

81.     Defendant CWC's Water was defective in design and unreasonably dangerous because, among other things:

> a)  PFAS Chemicals, including but not limited to PFOA and PFOS, cause extensive and persistent contamination when they come into contact with bodies of water and other water sources;
>
> b)  Water contaminated with detectable levels of PFAS Chemicals, including PFOA and PFOS, poses a significant threat to the health, safety, and welfare of those who ingest it; and
>
> c)  CWC did not design the Water to be adequately filtered to eliminate detectable concentrations of PFAS Chemicals, including but not limited to PFOA and PFOS.

82.     Defendant CWC failed and refused to implement changes in the design of the Water that would have reduced the PFAS concentration of the Water to non-detectable levels and thus would have prevented further exposing Plaintiffs and members of the Class to dangerous levels of PFAS Chemicals through their use of the Water.

83.     Throughout its conduct, defendant CWC failed to utilize the care required of a reasonably prudent drinking water manufacturer and seller under the circumstances, and the Water

bought and ingested by Plaintiffs and members of the Class was, as a result of defendant CWC's conduct, defective and unreasonably dangerous.

84.     The defective and unreasonably dangerous condition of the Water existed at the time the Water was distributed and sold by defendant CWC.

85.     Defendant CWC expected its Water to reach its ultimate user without substantial change in the condition in which the Water was designed and manufactured, and the Water did reach Plaintiffs and members of the Class without substantial change in condition.

86.     The foreseeable risk to public health and welfare, including that of Plaintiffs and members of the Class, posed by defendant CWC's Water outweighs the cost to defendant CWC of reducing or eliminating such risk.

87.     Defendant CWC knew or should have known about reasonably safer and feasible alternatives to the Water as manufactured and sold during the Class Period.

88.     As a direct and proximate result of defendant CWC's conduct, Plaintiffs have and will continue to suffer injuries and damages.

### E.     CPLA – MEDICAL MONITORING

89.     As a direct and proximate cause of defendant CWC's conduct, including the design, manufacture, and sale of PFAS-contaminated Water, Plaintiffs have been exposed to hazardous levels of PFAS Chemicals through their ingestion of defendant CWC's Water.

90.     As a result of the detectable (and therefore dangerous) levels of PFAS Chemicals in defendant CWC's Water, Plaintiffs have ingested and absorbed PFAS Chemicals, including PFOA and PFOS into their bodies, tissue, and cells where PFAS Chemicals are known to and have bioaccumulated over time. The presence of PFAS Chemicals in Plaintiffs' and members of the Class's bodies, tissue, and cells represents a manifest change in Plaintiffs' and members of the

Class's bodies, tissue, and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This bioaccumulation is a physiological change in Plaintiffs bodies occurring at a subcellular level.

91.    Medical testing presently exists for serious diseases, illnesses and injuries that can result from exposure to and the presence of PFAS Chemicals in the human body. Early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of disease, illness, or injury for all putative medical monitoring class members. Such testing is not routinely performed in the absence of the known exposure to PFAS Chemicals but conforms with the standard of medical and scientific care when such exposures are known.

92.    A medical monitoring program will allow for early detection and prompt and effective treatment of any serious disease, illness, or injury caused by PFAS Chemical exposure. A medical monitoring program will save lives, decrease the severity of illness, decrease the impact of illness on lives and families, and reduce the costs of caring for such illnesses, and are periodically necessary.

93.    The present value of the reasonable cost of such tests now and into the future can be calculated and known with reasonable certainty after further discovery is made.

F.    **CPLA – STATUTORY PUNITIVE DAMAGES**

94.    The harm suffered by Plaintiffs was the result of defendant CWC's reckless disregard for the safety of its product users, consumers, and others who were injured by defendant CWC's conduct.

95.    At all times relevant, the defendant CWC owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to

24

and/or conscious disregard of the health, safety, and well-being of Plaintiffs and members of the Class.

96.     Defendant CWC was at all relevant times aware of the considerable health risks that can result from exposure to PFAS Chemicals and PFAS-contaminated drinking water, including the risk of causing various forms of cancer to those who ingested drinking water contaminated with PFAS Chemicals.

97.     Defendant CWC was at all relevant times aware that the Water defendant CWC was selling to Plaintiffs and members of the Class was contaminated with detectable (and therefore dangerous) concentrations of PFAS Chemicals, including PFOA and PFOS.

98.     Defendant CWC therefore at all relevant times knew that its design, manufacture, and sale of PFAS-contaminated Water would be likely to result in the exposure of Plaintiffs and members of the Class to unreasonably dangerous levels of PFAS Chemicals, including PFOA and PFOS, via the ingestion of drinking water, which would likely cause significant personal injury to Plaintiffs and members of the Class.

99.     Notwithstanding this knowledge, defendant CWC acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

a)   Failing to take reasonable steps to minimize and/or eliminate the accumulation of PFAS Chemicals in the sources of defendants CWC's Water;

b)   Selling Water to customers, including Plaintiffs and members of the Class, that defendant CWC knew had detectable (and therefore dangerous)

concentrations of PFAS Chemicals and were thus likely to cause personal injury to Plaintiffs and members of the Class who ingested the Water;

c) Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to release of PFAS Chemicals into its water sources despite defendant CWC knowing that doing so was necessary to prevent personal injury to Plaintiffs and members of the Class;

d) Failing and refusing to implement changes in the design of the Water, including the utilization of filtration methods, that would have reduced the PFAS concentration of the Water to non-detectable levels despite knowing that the failure to do so would result in significant personal injury to Plaintiffs and members of the Class; and

e) Failing to warn Plaintiffs and members of the Class that the Water the ingestion of the Water defendant CWC designed, manufactured, and sold to them would result in significant personal injury to Plaintiffs and members of the Class.

100.   As a direct and proximate result of defendant CWC's willful, wanton, and reckless conduct, Plaintiffs and members of the Class suffered, presently suffer, and will continue to suffer personal injuries, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

**SECOND COUNT:** **VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. § 42-110a, *et seq.***

101.   The Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a, *et seq.*, declares that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

102.    At all relevant times, defendant CWC engaged in trade and/or commerce within Connecticut.

103.    Defendant CWC engaged in deceptive and unfair conduct in the conduct of trade and/or commerce within Connecticut, Plaintiffs and members of the Class have suffered ascertainable harm.

104.    Defendant CWC's conduct described above constitutes unfair and deceptive acts or practices in the conduct of their trade and commerce, as defined in General Statutes § 42-110a(4), within the State of Connecticut.

105.    Defendant CWC deceptively marketed, advertised, offered, and represented to Plaintiffs and members of the Class that the Water sold by defendant CWC was safe and reliable, when in fact that was not the case because it was contaminated with PFAS Chemicals, which are harmful to human health.

106.    CWC's deceptive conduct caused Plaintiffs and members of the Class to suffer ascertainable harm. Plaintiffs and members of the class paid to receive the safe and reliable water defendant CWC promised but did not receive it. Instead, Plaintiffs and members of the Class received low quality water contaminated with dangerous, unsafe PFAS Chemicals.

107.    Defendant CWC's deceptive conduct was likely to, and did in fact, deceive and mislead members of the public as to the quality of the Water, including consumers such as Plaintiffs and members of the Class acting reasonably under the circumstances, to their detriment.

108.    Defendant CWC also engaged in unfair conduct pursuant to CUTPA in that its conduct (1) caused or is likely to cause substantial injury to Plaintiffs and members of the Class; (2) the injury caused by defendant CWC could not have been reasonably avoided by Plaintiffs and

members of the Class, and (3) the injury caused by CWC to Plaintiffs and members of the Class is not outweighed by countervailing benefits to them.

109.     Defendant CWC's unfair conduct caused Plaintiffs and members of the Class to suffer ascertainable harm.

110.     Defendant CWC chose to sell Plaintiffs and members of the Class drinking water contaminated with PFAS Chemicals instead of installing adequate filtration systems which would reduce PFAS Chemical concentrations in the Water down to non-detectable levels. This unfair conduct caused substantial injury to Plaintiffs and members of the Class in that it exposed them to dangerous, hazardous levels of PFAS Chemicals via the ingestion of the drinking water sold by defendant CWC. These injuries could not have been reasonably avoided by Plaintiffs and members of the Class as they lacked adequate knowledge regarding the contamination and had no other options for publicly provided drinking water.

111.     Because defendant CWC knew or should have known that its conduct was deceptive and/or unfair under Conn. Gen. Stat. § 42-110b(a), its conduct was willful and/or was undertaken with reckless disregard for the harm it would cause Plaintiffs and members of the Class.

112.     Defendant CWC's deceptive and unfair acts described above directly and proximately caused Plaintiffs and members of the Class to suffer monetary losses not compensable under the CPLA. Therefore, Plaintiffs and members of the Class are entitled to relief under CUTPA for, *inter alia*, actual damages, attorneys' fees, and costs.

113.     Defendant CWC's deceptive and unfair conduct is continuing and CWC has given no indication that it intends to cease its course of conduct, posing a threat of future harm to Plaintiffs and members of the Class, such that prospective injunctive relief in the form of installation of filters and medical monitoring is necessary.

28

114.    Accordingly, Plaintiffs, individually and on behalf of all others similarly situated, seek (a) a declaration that defendant CWC's conduct described above violates the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.;* (b) an award of actual damages; (c) an award of attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g(d); (d) an order enjoining defendant CWC from continuing to engage in the unfair and deceptive acts and practices described above; and (e) any further relief the Court deems just and proper.

### CLAIMS FOR RELIEF

Plaintiffs, on behalf of themselves and members of the Class, claim monetary damages in excess of fifteen thousand dollars and equitable relief, including:

1. Damages for plaintiffs' financial losses;

2. Attorneys' fees and costs pursuant to Conn. Gen. Stats. § 52-240a;

3. Statutory punitive damages pursuant to Conn. Gen. Stats. § 52-240b;

4. Statutory punitive damages pursuant to Conn. Gen. Stats. § 42a-110g(a);

5. Attorneys' fees and costs pursuant to Conn. Gen. Stats. § 42a-110g(d);

6. Equitable relief in the form of an equitable order directing CWC to correct its practices and to install water treatment systems capable of and designed to filter PFAS contamination down to non-detectable levels and requiring the defendant CWC to establish a diagnostic medical testing program and medical monitoring protocol for Plaintiffs and the Class to monitor individuals' health and diagnose at an early stage any ailments that can result from exposure to PFAS Chemicals; and

7. Such other relief as the Court deems appropriate.

FRANCES HOFFNAGLE, LORI MONROE, and
CARLA TRACY

BY  */s/ Ian W. Sloss*_____
  Ian W. Sloss *Juris No. 434800*
  Johnathan Seredynski *Juris No. 439263*
  Krystyna Gancoss *Juris No. 438981*
  SILVER GOLUB & TEITELL LLP
  ONE LANDMARK SQUARE, Floor 15
  STAMFORD, CONNECTICUT 06901
  Tel. (203) 325-4491
  isloss@sgtlaw.com
  jseredynski@sgtlaw.com
  kgancoss@sgtlaw.com


PLEASE ENTER THE APPEARANCE OF:

SILVER GOLUB & TEITELL LLP
ONE LANDMARK SQUARE, 15TH FL.
STAMFORD, CT 06901
(203) 325-4491
JURIS NO. 058005

FOR THE PLAINTIFFS

A TRUE COPY ATTEST

KEITH D. NIZIANKIEWICZ
CONNECTICUT STATE MARSHAL
INDIFFERENT PERSON

30

# JPML TRANSFER ORDER

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: AQUEOUS FILM-FORMING FOAMS
PRODUCTS LIABILITY LITIGATION                                    MDL No. 2873

TRANSFER ORDER

**Before the Panel**:*  Defendant 3M Company moves under 28 U.S.C. § 1407(c) to transfer the three actions listed on Schedule A to the District of South Carolina for inclusion in MDL No. 2873.  Plaintiffs in the *Broy* and *State of Illinois* actions oppose transfer.  No party responded to the motion to transfer the *City of Corona* action.

This litigation involves allegations that aqueous film-forming foams (AFFFs), which are used to extinguish liquid fuel fires, contaminated the groundwater near locations where they were used with perfluorooctane sulfonate (PFOS) and/or perfluorooctanoic acid (PFOA), which allegedly were contained in the AFFFs and are toxic.  *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (J.P.M.L. 2018).  Because an MDL that incorporated all actions involving PFOA or PFOS would raise management concerns due to its breadth, we have, since the outset of this litigation, limited the MDL to actions that involve claims relating specifically to AFFFs.  *See id.* at 1396.  For this reason, parties seeking to transfer an action that does not on its face raise AFFF claims bear a significant burden to persuade us that transfer is appropriate.  *See* Order Denying Transfer at 2, MDL No. 2873 (J.P.M.L. Dec. 18, 2019), ECF No. 541.

Turning first to *City of Corona*, the initial complaints filed in this action did not, on their face, involve AFFF claims, but were more generally directed to alleged contamination by per- or polyfluoroalkyl substances (PFAS) stemming from two industrial facilities within the City that allegedly manufacture roofing shingles.  The most recently amended complaint, however, includes allegations that some of the alleged PFAS contamination may have been caused by the use or disposal of AFFF products.  In addition, 3M argues that the same contaminated water supply is at issue in at least one other action pending in the MDL.[1]  3M further states that counsel for plaintiffs have informed 3M that they do not oppose transfer.  In these circumstances, 3M has met its burden of showing that this action raises factual questions pertaining to AFFFs and that transfer is appropriate.

_____

* Judge David C. Norton did not participate in the decision of this matter.

[1] *See Orange County Water Dist. v. 3M Co.*, C.A. No. 2:22-01798 (D.S.C. transferred Jun. 1, 2022).

- 2 -

The *Broy* action involves much the same facts as *City of Corona*. Plaintiffs seek to represent a putative class of all persons within the City of Corona who were exposed to the PFAS allegedly contaminating the City's water supply. Unlike the *City of Corona* complaint, the *Broy* complaint does not contain any allegations relating to AFFFs. But plaintiffs' claims in *Broy* substantially overlap with the claims in *City of Corona* and necessarily will involve common questions of fact regarding, for instance, the nature of the alleged PFAS contamination and its source(s). Plaintiffs' arguments to the contrary are not persuasive. Their own water provider is alleging that the water contamination at issue in both *Broy* and *City of Corona* was caused, at least in part, by AFFFs. Regardless of how plaintiffs characterize their complaint, these actions are sufficiently intertwined that transfer is necessary to avoid duplicative discovery and pretrial proceedings.

Plaintiffs in *Broy* also argue that the procedural posture of the MDL counsels against transfer. This argument, too, is unconvincing. While much of the common discovery in the MDL has been completed, the bellwether discovery and trial process has only just begun, with the first water provider bellwether trial scheduled to begin in June 2023. There remains ample scope for the parties and the courts to realize efficiency and convenience benefits through continued transfer of actions to MDL No. 2873.

The motion to transfer in *State of Illinois* presents a somewhat closer question. The State brings this action as *parens patriae* to hold defendants liable for PFAS contamination of Illinois' natural resources. The State in its complaint explicitly excludes PFAS contamination stemming from AFFF use or disposal, and it has filed a separate "AFFF action" directed to such contamination. Even so, as defendant 3M argues in its motion, the State's complaint identifies specific "community water supplies" (CWS) that are at issue in the MDL. Specifically, the complaint identifies the Evanston, Fox Lake, and Hawthorn Estates CWS as allegedly contaminated PFAS sites at issue in this action. *See* Compl. ¶¶ 252–60, 282–91, 302–11, *State of Illinois*, C.A. No. 1:23-01341 (N.D. Ill.). But the City of Evanston, Village of Fox Lake, and Hawthorn Estates have each directly filed actions in the MDL seeking to recover costs related to the alleged contamination of those sites caused by AFFF.[2] In addition, the State cites in its complaint an Illinois EPA listing of "PFAS Sites," many of which are also the subject of municipal AFFF actions in the MDL. *See id.* ¶ 15 & n.2.

---

[2] *See* Compl. ¶ 11, *City of Evanston, Ill. v. 3M Co.*, C.A. No. 2:22-04304 (D.S.C. filed Nov. 29, 2022) ("PFAS containing fluorochemicals/intermediates and AFFF were used at fire training facilities, and/or fire departments such that those compounds traveled by stormwater, surface water, groundwater, and contaminated Plaintiff's drinking water supply."); Compl. ¶ 11, *Village of Fox Lake, Ill. v. 3M Co.*, C.A. No. 2:22-04086 (D.S.C. filed Nov. 16, 2022) (same); Compl. ¶¶ 6, 11–12, *Hawthorn Estates v. 3M Co.*, C.A. No. 2:23-00503 (D.S.C. filed Fe. 6, 2023) (alleging that defendants' AFFF products were "sold to fire training facilities, such as the Grundy Area Vocational Center ('GAVC')," that "[f]ire training facilities, such as GAVC, used AFFF Products containing PFOS and PFOA," and that the alleged "contamination is a direct and proximate result of fire training activities at GAVC that used AFFF, resulting in the migration of PFAS into Plaintiff's groundwater supplies").

- 3 -

In opposition to transfer, the State characterizes the municipal complaints in the MDL as speculative, whereas the State's complaint allegedly is based on an extensive preliminary investigation. This argument proves too much, as it would require the Panel to essentially engage in a merits review of the complaints based on the amount of detail of plaintiffs' respective pre-suit investigations. It is sufficient that multiple CWS complaints in the MDL involve the same water sources as the State of Illinois complaint. Just as with *Broy* and *City of Corona*, transfer of *State of Illinois* is necessary to avoid overlapping discovery and duplicative pretrial proceedings.[3] *Cf.* Transfer Order at 1, MDL No. 2873 (Apr. 2, 2019), ECF No. 384 (transferring actions brought by the State of New York and the State of Ohio, in part because "at least three contamination sites identified in these complaints . . . already are at issue in actions brought by non-state entities pending in the MDL").

The State's various arguments that transfer of its action would violate the Tenth and Eleventh Amendments to the U.S. Constitution are not well taken. The Panel has transferred several state *parens patriae* actions to the MDL. *See id.*[4] To the extent the State takes issue with the transferee court's organization of the MDL (specifically, with respect to lead counsel), it may of course raise these issues with the transferee court. But we note that actions transferred under Section 1407 "ordinarily retain their separate identities." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015). Thus, the transferee court's appointment of leadership counsel to organize the litigation should not affect the Illinois Attorney General's representation of the State. And, to the extent the State argues that sovereign immunity requires remand of its action to state court, we

---

[3] The State relies heavily on two Panel orders declining to transfer actions to MDL No. 2873, both of which are readily distinguishable. The State points to our order denying transfer of an action by the State of New Hampshire that, like the State of Illinois here, sought damages for alleged statewide PFAS contamination of natural resources and separately filed an AFFF action that was transferred to the MDL. *See* Order Vacating Conditional Transfer Order, MDL No. 2873 (J.P.M.L. Aug. 3, 2022), ECF No. 1511. There was no argument that other actions in the MDL brought by municipalities or water suppliers alleged that the water sources at issue in the New Hampshire complaint were contaminated through AFFF use or disposal.

Similarly, the State compares its action to the eight Long Island water provider/municipality actions that we declined to transfer to the MDL. *See* Order Denying Transfer, MDL No. 2873 (J.P.M.L. Mar. 27, 2020), ECF No. 620. Defendants there argued that plaintiffs all drew water from the same aquifer on Long Island, which was already at issue in the MDL. But, like *State of New Hampshire*, no party argued that the individual CWS themselves were at issue in the MDL, and we declined to adopt defendants' conclusion that, because one Long Island municipality had alleged AFFF contamination, any PFAS action brought by a Long Island CWS, anywhere within the aquifer, necessarily involves AFFF. *Id.* at 2 n.3.

[4] *See also* Transfer Order, MDL No. 2873 (J.P.M.L. Jun. 2, 2020), ECF No. 650 (transferring *State of New Mexico*); *In re AFFF*, MDL No. 2873, 2021 WL 755083, at *3-4 (J.P.M.L. Feb. 4, 2021) (transferring State of Michigan's putative "commercial AFFF" case); Transfer Order at 3–5, MDL No. 2873 (J.P.M.L. Jun. 7, 2021), ECF No. 1020 (transferring State of Michigan's putative "non-AFFF" case); Transfer Order at 2, MDL No. 2873 (J.P.M.L. Dec. 13, 2022), ECF No. 1646 (transferring *State of Wisconsin*).

- 4 -

note that such jurisdictional objections generally do not present an impediment to transfer.[5] *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 170 F. Supp. 2d 1346, 1347–48 (J.P.M.L. 2001) ("[R]emand motions can be presented to and decided by the transferee judge.").

Accordingly, after considering the argument of counsel, we find that the actions listed on Schedule A involve common questions of fact with the actions transferred to MDL No. 2873, and that transfer under 28 U.S.C. § 1407 will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. In our order centralizing this litigation, we held that the District of South Carolina was an appropriate Section 1407 forum for actions in which plaintiffs allege that AFFF products used at airports, military bases, or certain industrial locations caused the release of PFOS and/or PFOA into local groundwater and contaminated drinking water supplies. The actions in the MDL share factual questions concerning the use and storage of AFFFs; the toxicity of PFAS and the effects of these substances on human health; and these substances' chemical properties and propensity to migrate in groundwater supplies. *See In re AFFF*, 357 F. Supp. 3d at 1394. The three actions listed on Schedule A, for the reasons stated, will share common questions of fact with the AFFF actions in the MDL and will benefit from inclusion in the centralized proceedings. Even so, we recognize that transfer of actions that, on their face, do not allege AFFF claims could increase the complexity of this already complex litigation. Should the transferee judge determine that continued inclusion of these actions in the MDL will not enhance the convenience of the parties and witnesses or the efficiency of the litigation, he can suggest Section 1407 remand of these actions with a minimum of delay. *See* Panel Rules 10.1–10.3.

IT IS THEREFORE ORDERED that the actions listed on Schedule A are transferred to the District of South Carolina and, with the consent of that court, assigned to the Honorable Richard M. Gergel for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

*Karen K. Caldwell*

Karen K. Caldwell
Chair

| | |
|---|---|
| Nathaniel M. Gorton | Matthew F. Kennelly |
| Roger T. Benitez | Dale A. Kimball |
| Madeline Cox Arleo | |

---

[5] Panel Rule 2.1(d) expressly provides that the pendency of a conditional transfer order does not limit the pretrial jurisdiction of the court in which the subject action is pending. Between the date a remand motion is filed and the date that transfer of the action to the MDL is finalized, a court generally has adequate time to rule on a remand motion if it chooses to do so.

**IN RE: AQUEOUS FILM-FORMING FOAMS**
**PRODUCTS LIABILITY LITIGATION**                    MDL No. 2873

## SCHEDULE A

<u>Central District of California</u>

BROY, ET AL. v. 3M COMPANY, ET AL., C.A. No. 5:23−00194
CITY OF CORONA, ET AL. v. 3M COMPANY, ET AL., C.A. No. 5:23−00208

<u>Northern District of Illinois</u>

PEOPLE OF THE STATE OF ILLINOIS v. 3M COMPANY, ET AL.,
        C.A. No. 1:23−01341